Points Decided.

(May 26, 1916.)

S. W. WOLF, Respondent, v. HARRY K. EAGLESON, Appellant, and MELROSE YOUMANS, Respondent, v. HARRY K. EAGLESON, Appellant.

[157 Pac. 1122.]

CONTRACTS FOR SALE OF REAL PROPERTY—STATUTE OF FRAUDS—INSUFFICIENT MEMORANDUM OF AGREEMENT—PART PERFORMANCE—EVIDENCE—PRESUMPTION AS TO EVIDENCE NOT IN RECORD—FINDING OF ULTIMATE FACT—JUDGMENT ON CONFLICTING EVIDENCE.

1. Memorandum of agreement for sale of real property considered and *held* that such memorandum is too indefinite to take the agreement out of the statute of frauds.

2. Part performance of an oral agreement for the sale of real property, when proven, gives a court of equity power to compel specific performance of such contract.

3. In an action for specific performance of a contract for the sale of real property, the property in question being a forty-acre tract described by legal subdivisions in the complaint, the plaintiff on the trial was unable to testify as to the legal subdivisions but drew a sketch of the forty-acre tract on a sheet of paper, which indicated its location with reference to adjoining subdivisions of the section in which said forty-acre tract was situated. The record discloses no other evidence identifying the description of the forty-acre tract as alleged in the complaint. *Held,* that it must be presumed on appeal from a judgment for specific performance that the trial court had before it sufficient evidence upon which to base its decree.

4. Where the trial court makes a finding of fact to the effect that the rescission of a certain contract "was understood between the parties thereto to be a settlement of all actions between the plaintiff and defendant growing out of said contract," it is not necessary for the court to make findings on certain affirmative allegations of defendant's answer claiming items of damage for violation of the contract on the part of plaintiff, since the finding in question was ultimate in its nature and in itself disposed of all claims made by defendant arising out of such contract.

5. Where conflicting evidence is submitted to a trial court sitting without a jury, either as a court of law or as a court of equity, the findings of the court on questions of fact will not be disturbed where there is some competent evidence to support them.

6. Contracts for the sale of real property considered, and *held* that the consideration was adequate.

[As to part performance of parol exchange of lands, see note in **Ann. Cas. 1912A, 309.**]

APPEALS from the District Court of the Seventh Judicial District for Canyon County. Hon. Ed. L. Bryan, Judge.

Actions to recover on contracts for the sale of real property. Judgments for plaintiffs. *Affirmed.*

E. J. Frawley and Scatterday & Van Duyn, for Appellant.

The affirmative allegations in the counterclaim upon which affirmative relief is asked for have been completely disregarded. A trial court must find upon all the material issues raised by the pleadings. (*Brown v. Macey,* 13 Ida. 451, 90 Pac. 339; *Wood v. Broderson,* 12 Ida. 190, 85 Pac. 490; *Stoneburner v. Stoneburner,* 11 Ida. 603, 83 Pac. 938.)

Where a party is seeking to enforce in equity the specific performance of a contract, there must be an allegation of facts which affirmatively show the adequacy of consideration. A mere statement of the price agreed to be paid is not enough. (*White v. Sage,* 149 Cal. 613, 87 Pac. 193; *Prince v. Lamb,* 128 Cal. 120, 60 Pac. 689; *Flood v. Templeton,* 148 Cal. 374, 83 Pac. 148; *Waymire v. Waymire,* 141 Ind. 164, 40 N. E. 523; *Mayger v. Cruse,* 5 Mont. 485, 6 Pac. 333; *Sunrise Land Co. v. Root,* 160 Cal. 95, 116 Pac. 72.)

Rice, Thompson & Buckner, for Respondents.

Evidence of the agreement cannot be received without the writing or secondary evidence of its contents for the sale of real property or of an interest therein. In the case of a novation, one of the requirements is that the new contract substituted for the old must be a valid contract. (*Spycher v. Werner,* 74 Wis. 456, 43 N. W. 161, 5 L. R. A. 414; *Pope v. Vajen,* 121 Ind. 317, 22 N. E. 308, 6 L. R. A. 688; *Hill v. Warner,* 20 Ind. App. 309, 50 N. E. 582; *Piehl v. Piehl,* 138 Mich. 515, 101 N. W. 628; *Sutter v. Moore Inv. Co.,* 30 Wash. 333, 70 Pac. 746.)

Respondent contends that this is not a case of novation, but is a case of accord executory. It is not the new promise itself, but the performance of the new promise that is accepted as satisfaction. (1 R. C. L. 178; *Kromer v. Heim,* 75 N. Y. 574, 31 Am. Rep. 491.)

An unexecuted accord is no bar to an action on the original undertaking. (*Manley v. Vermont Mut. Fire Ins. Co.,* 78 Vt. 331, 62 Atl. 1020, 6 Ann. Cas. 562; *Hard v. Burton,* 62 Vt. 314, 20 Atl. 269; *Bandman v. Finn,* 185 N. Y. 508, 78 N. E. 175, 12 L. R. A., N. S., 1134.)

The testimony in the Wolf case shows that it was the performance of the new agreement which was to effect the settlement.

SULLIVAN, C. J.—These cases were separately tried in the court below, and the parties plaintiff, the causes of action and the subject matter are different, but as the questions at issue arise out of identical transactions and circumstances, the cases were briefed and argued together in this court, and they will be considered together in this opinion.

On January 30, 1907, H. K. Eagleson, the defendant, and plaintiff S. W. Wolf entered into a written contract concerning a tract containing half a section of land near Parma, in Canyon county, which had shortly before been acquired by Eagleson. The contract contained, among others, the following provisions:

Eagleson sold to Wolf an undivided half interest in the 320 acres in question, describing it, for the sum of $8,000, $706.50 of which was acknowledged to be paid, the balance of the purchase price to be paid on or before January 1, 1912, with interest at six per cent, deed to be given to such undivided interest when the payments on the contract amounted to a stipulated sum. Wolf was to enter into possession of the tract and proceed to cultivate and improve it. The payment of $706.50 by Wolf on this contract was in the form of a half interest in personal property belonging to Wolf, said personal property consisting of livestock, tools and implements, which it was stipulated should be used on said premises for the joint

account of both parties. Eagleson agreed to advance during the year of 1907 the sum of $500 for implements and improvements. Wolf assumed an undivided one-half of a mortgage of $5,000 which was then against the property, said amount to be deducted from the purchase price stipulated. The parties were to share equally in the expenses of cultivating and improving the tract, including taxes and interest, and also to share equally in the net earnings. Wolf was to pay all the personal expenses of himself, family and employees, and was to pay personally for any help which he might employ. The following provision was also included: "It is further stipulated that in the event that the parties hereto shall agree to sell any portion or all of the above-described premises that the undivided one-half of such sale price belonging to second party shall be applied on the purchase price herein mentioned until the same is fully paid and satisfied."

Wolf went into possession under this contract and shortly thereafter employed the plaintiff Melrose Youmans to work for him. Youmans lived with the Wolf family.

It appears from the evidence that in the latter part of 1910, both parties to the above contract became somewhat dissatisfied and desired to terminate it. About this time Eagleson proposed to Wolf to surrender to Wolf his interest in the personal property in consideration of a rescission of the contract. Wolf thought that he should receive more than the personal property merely, and suggested the additional consideration of $1,300. This Eagleson declined to consider. A few months thereafter Eagleson had a prospect of selling one-half of the 320 acres to one Larson for $50 an acre. This was an additional incentive to Eagleson to negotiate for the termination of the contract between himself and Wolf, and, according to the testimony of Mr. and Mrs. Wolf, he came down from Boise to their place in February, 1911, for that purpose. About this time it also appears that the plaintiff Youmans had become somewhat uneasy about the payment of arrears of wages due him from Wolf, and that all the parties, including Eagleson, went over the book entries of

Youmans' account with Wolf and agreed that there was due Youmans on that account the sum of $1,218.

The plaintiffs and Mrs. Wolf agree substantially in their evidence as to the terms of the oral agreement which was made in February or March, 1911, between Eagleson and Wolf to take the place of the first contract and which for convenience we will hereafter refer to as the second contract. The substance of this latter agreement was that in case Eagleson succeeded in selling part or all of the property, he should pay Wolf $1,500 and surrender to Wolf his share of the personal property, in consideration of a relinquishment by Wolf of all his interest in the land. Youmans was to get his wages out of the $1,500. The making of this agreement is denied by Eagleson. It appears, however, that on March 22, 1911, Wolf gave Eagleson a quitclaim deed for that half of the 320 acres which Eagleson desired to sell to Larson, and that Eagleson consummated the sale to Larson on May 9th. The Wolfs testify that they thereafter importuned Eagleson to carry out his part of this contract and make payment of the $1,500, but that he failed to do so. They then entered into further negotiations with Eagleson, which never resulted in performance on either side. These negotiations, however, appear to have ripened into a sort of tentative understanding between the plaintiffs, on the one hand, and Eagleson, on the other, which was intended to settle and adjust all matters between them. By this agreement Wolf was to take 120 acres of the quarter-section remaining after the sale to Larson and Youmans was to take forty acres, all at the price of $50 per acre. No part of this was to be paid in cash by either Wolf or Youmans. Youmans was to be credited with $1,000 of the purchase price of his forty acres on account of wages due him from Wolf, and this $1,000 was to be assumed by Wolf, so that Youmans would give a mortgage of $1,000 to Eagleson for his 40 acres, and Wolf a mortgage of $7,000 for his 120 acres. These mortgages were to be due in three years, with interest at eight per cent. This alleged agreement we will refer to hereafter as the third contract. Eagleson also denies the making of this contract.

The complaint in the Wolf case, which was filed on December 30, 1911, alleged the written contract of 1907 between Wolf and Eagleson, its recission by the oral contract of March, 1911, the consideration of the quitclaim deed given by Wolf and the resulting surrender of the 160 acres covered by said deed, and prayed for judgment against defendant for the sum of $1,500.

The answer admitted the execution of the contract of 1907 and denied that defendant Eagleson had ever agreed to rescind it or that he ever made the contract of 1911 alleged by plaintiff. By way of counterclaim defendant alleged that plaintiff Wolf had not contributed his share of the expense of operation under the contract, but, on the other hand, had converted to his own use defendant's share of the proceeds, and had also, on or about May 1, 1912, converted to his own use defendant's half of the personal property; that plaintiff Wolf had been remiss in improving and cultivating and caring for the premises as he had obligated himself to do under the contract; that he had failed to pay to defendant the $8,000 purchase price called for by the contract or to pay any part of the mortgage or interest assumed by him, and that defendant had been compelled, in order to preserve the premises from foreclosure, to pay the same himself. For all these various items of damage he prayed judgment in the sum of $4,396.52.

The case was tried to the court without a jury. The court found that Eagleson and Wolf made the second contract as alleged; that Wolf had agreed to pay Youmans $1,000 out of the $1,500 received from Eagleson, and that by mutual agreement between the parties, said $1,000 was credited by Eagleson on the purchase price of the forty agreed to be conveyed by Eagleson to Youmans, Wolf being thereby released from the payment of said amount to Youmans. Judgment was accordingly rendered for Wolf for $1,500, less the $1,000 credited by Eagleson on his contract with Youmans, so that Wolf got a money judgment of $500. It was also found by the court that the relinquishment and rescission of the first contract between Wolf and Eagleson was "understood between the parties

thereto to be a settlement of all accounts between plaintiff and defendant growing out of said contract.''

The complaint in the Youmans case, which was filed February 19, 1912, alleged that in February, 1911, the defendant Eagleson owned the forty acres described as the SE. ¼, NW. ¼ of Sec. 7, Tp. 5 N., R. 5 W., B. M.; that at that time Eagleson and Wolf owed Youmans $1,218, and that defendant Eagleson then made an agreement with Youmans, whereby he contracted to sell to Youmans the forty acres above described for $2,000, the terms of payment to be as heretofore specified in the so-called third contract between all these parties, Youmans to give a $1,000 mortgage to Eagleson and Wolf to assume the remaining $1,000 of the purchase price by adding the same to the mortgage to be given by Wolf on the adjoining 120 acres, mortgage and note to run for three years; that defendant promised to execute a deed to plaintiff Youmans as soon as he made the sale to Larson, which conveyance to Larson was made on May 9, 1911; that defendant had ever since refused to make such deed to plaintiff, though plaintiff stood ready to execute the note and mortgage as agreed, but that pursuant to said contract defendant did put plaintiff in possession of said forty-acre tract, and that he had been in the sole possession of it from that time on, and had made improvements to the value of $400. Plaintiff further alleged that by reason of defendant's failure to perform he had been damaged in the sum of $700, for which he demanded judgment, also praying specific performance of the alleged contract, to wit, the execution of a deed by Eagleson on execution and delivery of the note and mortgage for $1,000.

The answer of defendant Eagleson to this complaint denied practically all of its material allegations, including Youmans' possession of the premises.

This case was also tried to the court without a jury, and the court found that the contract had been made between the parties as alleged, and that Youmans had made improvements since going into possession of the value of $250, and specific performance of the contract was decreed as prayed for.

The evidence in these cases is confusing and often contradictory, but this is to be ascribed partly to the repeated shifting of position by the parties in respect to the three successive contracts and their obligations under them. The last two contracts were also entirely oral, and their terms and the circumstances attending their negotiation depended on the memory of interested witnesses after some period of time had elapsed.

Taking the Wolf case first, the preponderance of the evidence shows the making of the second contract in February, 1911, as alleged. Youmans corroborated the Wolfs as to its terms and conditions. The making of this contract is also strongly corroborated by the circumstances of the execution of the quitclaim deed by Wolf to Eagleson on March 22, 1911, for the nominal consideration of one dollar, in order that Eagleson might make the sale of the 160 acres to Larson. There is no sufficient explanation anywhere in the testimony as to the actual consideration to Wolf for this deed, except on the theory of such an agreement as is testified to by plaintiffs. The defendant himself, although he denied the execution of this contract, and does not directly undertake to state the consideration for Wolf's release of his interest in the 160 acres sold to Larson, makes a somewhat significant statement in regard to the matter upon his cross-examination in the Youmans' case referring to his conversation with Wolf:

"Q. Relate the conversation, if you can, or the substance of it in which this agreement to join in the sale to Larson.

"A. We were talking about the mortgage coming due in the fall, and we figured we better sell that quarter-section and relieve that mortgage and place us both in better shape."

This statement of Eagleson is consistent with his allegation that the first contract was never rescinded by him, but if that be true, the query then arises, why did he not apply the Larson purchase money on this first contract with Wolf, in accordance with its provision, that in case of a sale of any or all of the land, the half of the sale price should be applied on the purchase price to be paid by Wolf? He alleges in his answer that Wolf never paid the $8,000 purchase price under the first contract, nor any part of the $5,000 mortgage.

As already observed, the determination of what these parties really agreed to do under either the second or the third contract is rendered quite difficult, not only by reason of the fact that these contracts were entirely oral, but also from the fact that the making of one agreement cannot be said to have clearly succeeded and superseded the operation of the other. The treatment of these respective contracts by the parties as existing contracts overlapped to some extent, so that it is not always easy to separate them for the purposes of this adjudication. For instance, Youmans alleges that at the time the second contract was made, about February, 1911, Eagleson then agreed to sell him the forty acres on the terms already specified as being part of the third contract, but on cross-examination he was inclined to fix the time in March, after the making of the second contract.

Counsel for appellant complains that the findings and judgments are inconsistent, for the reason that the court repudiated the third contract as between Eagleson and Wolf, and allowed Wolf to recover on his second contract with Eagleson, while in the Youmans' case he enforced specific performance of the third contract with Eagleson so far as it referred to Youmans, although the making of this agreement to deed Youmans the forty acres on his giving a $1,000 mortgage was dependent on Wolf's giving a $7,000 mortgage in exchange for a deed on the adjoining 120 acres. In other words, the third contract could not be repudiated as to Wolf without destroying a part, at least of the consideration for which it was made with Youmans. These contentions are entitled to serious consideration, and make it necessary to analyze as precisely as possible the contractual relations of the parties under both of these so-called oral contracts.

It is obvious that there is ample evidence to the effect that Wolf made part performance at least of the second contract. He gave a quitclaim deed to Eagleson for the 160 acres which the latter desired to sell to Larson and he surrendered possession. This took the contract out of the statute of frauds and made it both provable and enforceable. But when we come to the so-called third contract, it appears that as between Eagle-

son and Wolf there was no performance on either side, nor any memorandum of agreement which could take it out of the statute. There was indeed a good deal of evidence in regard to a memorandum of agreement signed by Eagleson some time in the latter part of 1911 and given by him to Wolf, but which could not be produced at the trial. The witnesses testified variously as to the contents of this memorandum. Some time after the trial of these cases, the paper in question was found and by stipulation filed among the exhibits. It reads as follows:

(No date.)

"The following agreement to be entered into on payment of interest of the sum of $320.00 by Dec. 10, 1911—

"H. K. E. to make contract on land covering 5 years int. to be paid Dec. 1st each year—$2500 to be paid at the end of 3 years bal in 5 years S. W. Wolf to reimburse H. K. E. for taxes each year.

"H. K. EAGLESON."

It is manifest that this memorandum is much too indefinite in its terms to take an agreement for the sale of real property out of the statute.

Now, when we come to the contractual relations of Eagleson and Youmans under the so-called third contract, the position of the parties is reversed. Although there was no performance of this contract as between Eagleson and Wolf, there was part performance of this contract as between Eagleson and Youmans, since Eagleson put Youmans in possession of the forty in question as early as April or May, 1911, and allowed him to remain in undisturbed possession up to the time of the trial, about two years later. Eagleson denies this, but the preponderance of evidence is for plaintiff, since both Youmans and his brother testify that about April, 1911, they called on Eagleson at his office in Boise City and plaintiff asked Eagleson to give him a deed or some writing to show the interest in the forty which Eagleson had agreed to transfer to him; that Eagleson replied he was not in a position to give a clear title to the property at that time, but that Youmans might go immediately on the land, put in crops and make improvements as if it

were his own.   Youmans testified that he relied on this assurance and at once took complete possession of the forty.   Youmans was therefore in a position to prove and enforce the third contract as against Eagleson.

Counsel for appellant contends that according to the testimony of Youmans' own witnesses, Mr. and Mrs. Wolf, the alleged third contract as between Eagleson and Youmans was dependent upon Wolf's taking the remaining 120 acres of the quarter-section and giving a mortgage of $7,000 thereon, which Wolf's evidence showed that he did not care to do, and he never, either in his pleading or on the trial, alleged that he was ready and willing to perform.   It must be conceded that plaintiff's evidence in each of these cases is in many respects somewhat contradictory and confused, and in particular with regard to the contract upon which at any given time they relied. But we think a fair conclusion to be drawn from the testimony of the Wolfs is that they entered into the third contract with Eagleson conditionally: in the first place, conditioned on their inability to get him to perform his part of the second contract, which they would have all along preferred; in the second place, although they gave a promise for a promise in making the third agreement, there is evidence to the effect that they did not consider the making of these promises constituted the contract, but that its consummation was dependent on performance by Eagleson.   For instance, Wolf was asked on cross-examination, with reference to negotiations under the third contract: "Q. You were not expecting the $1,500 at that time?  A. We expected it all the time until he could make some arrangement so we would be sure of something else.'' We think, under the circumstances shown in evidence, Wolf was justified in repudiating the third contract and standing on the second, but this does not wholly remove the difficulty so far as the consideration for the conveyance of the Youmans' forty is concerned, if that matter be deemed to belong to the third contract.   We must in that case assume that part of the consideration for Eagleson's agreement to deed Youmans the forty acres for $1,000 on mortgage was the simultaneous agreement on the part of Wolf to take the remaining 120 of the

quarter-section for $7,000 on mortgage. The lower court solved part of this problem by deducting $1,000 from the judgment against Eagleson in the Wolf case, so that upon enforcement of specific performance in the Youmans' case, requiring Youmans to give a $1,000 mortgage in exchange for deed, Eagleson would then be getting his agreed price of $50 per acre. But the question still remains: Was not the agreement for sale to Wolf part of the inducement for the terms given Youmans, and if the agreement for sale to Wolf is repudiated, is it fair to Eagleson to enforce that agreement in the case of Youmans only? There is, however, evidence to show that Eagleson himself repeatedly refused to carry out the third contract, by which he might have sold Wolf this 120 acres. If, therefore, by the enforcement of the contract with Youmans, Eagleson is placed in a less advantageous position than he would be if he had consummated the same contract with Wolf also, it would seem to be wholly the result of his own conduct and of which he can hardly be heard to complain.

It appears to us that the trial court has approximated an equitable adjudication out of the tangle of contractual relations in which the parties to these actions were involved, and as there is some evidence to support his findings, they will not be disturbed by this court, under the application of the familiar rule, where the evidence is as conflicting and unsatisfactory as it is in these cases.

Counsel for appellant contends that it is not reasonable to suppose that Eagleson would have made an agreement to sell the quarter-section in question to Wolf and Youmans entirely on mortgage and without any cash payment, since neither of them were men of financial means or standing. But it must be remembered that Eagleson had already received a large part of the consideration for such a transaction by the quitclaim deed which Wolf had given him. It is also objected that the Youmans' forty, in regard to which specific performance was prayed in the complaint, was not identified on the trial, and that there is therefore no evidence on which to base a decree for specific performance. On referring to the record, it appears that Youmans on the witness-stand was

unable to give a description of the forty in question by legal subdivisions, but that at the request of counsel he drew a sketch of the location of the forty with reference to the other subdivisions of the half section, which sketch was admitted in evidence as Plaintiff's Exhibit "A." We must assume, therefore, in accordance with the well-known rule, that the trial court based its finding as to the identity of this forty acres upon satisfactory evidence. There is also a disagreement between plaintiff's witnesses in the Youmans case as to the term for which the mortgage was to run, but there is some evidence to support the allegation of the complaint that the time was to be three years.

It is contended by counsel that in the Wolf case the findings of the court cover only the allegations of the complaint, and that the affirmative allegations in defendant's counterclaim, upon which affirmative relief was asked, have been entirely disregarded. These allegations had reference to specific items of damage sustained by defendant by reason of alleged failure of plaintiff to carry out the first or written contract and the alleged conversion of the personal property by plaintiff. As we have already observed, the court found in its seventh finding of fact, "That the said relinquishment and rescission of the contract mentioned in the first paragraph hereof was understood between the parties thereto to be a settlement of all accounts between plaintiff and defendant growing out of said contract." This finding is very explicit and comprehensive, and it is ultimate in its nature, since it declares that the rescission of the first contract was understood between the parties to effect a settlement of all matters between them growing out of the first contract. Having found the ultimate fact which disposed of defendant's entire demand for relief under the provisions of the first contract, it was not necessary for the court to make the subsidiary or intermediate findings which might lead up to it. (*Fouch v. Bates,* 18 Ida. 374, 110 Pac. 265; *Jones v. Vanausdeln,* 28 Ida. 743, 156 Pac. 615.)

A number of California cases are cited by counsel to the effect that in an action for specific performance the complaint

must allege affirmatively adequacy of consideration and the mutuality of the contract as a basis for a decree. These decisions appear to be based upon a provision of the California Civil Code (sec. 3391), which provides that specific performance cannot be enforced against a party to a contract if he has not received an adequate consideration therefor, and if it is not shown to be as to him fair and reasonable. We do not know of any provision of this sort in our Idaho statutes, or of any such formal rule of practice in this state. As a matter of fact, the proof showed that the price of $50 an acre for the land covered by the Youmans contract was certainly not inadequate, since Eagleson had sold 160 acres of adjoining land just about that time for the same price, and there was evidence to the effect that the greater part of the improvement made on the whole half section had been made on the quarter-section so sold.

From an examination of the whole record, we find no reversible error, and conclude accordingly that the judgment of the lower court must be affirmed. Costs awarded to respondents.

Budge and Morgan, JJ., concur.